**E & E CONSTRUCTION CO., et al., Plaintiffs,**

v.

**STATE OF ILLINOIS, et al., Defendants.**

No. 87 C 6289.

United States District Court, N.D. Illinois, E.D.

Nov. 26, 1987.

Gerard C. Smetana, David G. Duggan, Abramson G. Fox, Chicago, Ill., for plaintiffs.

Moshe Jacobius, William F. Kane, William F. McGlynn, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

On July 15, 1987 E & E Construction Co. ("E & E") and Easlick Contracting, Inc. ("Easlick") (collectively, with Midwest Construction Co. ("Midwest"),[1] the "Corporate Plaintiffs"), joined by Brent Pinter, David Frick, Kenneth Smith, Lawrence McCoy and David Youngstrom (collectively "Individual Plaintiffs"), sued the State of Illinois Department of Labor ("Department") and three Department officials (collectively "Individual Defendants"), claiming the Illinois Preference Act (the "Act," Ill.Rev.Stat. ch. 48, ¶¶ 2201–2207) violates several provisions of the United States Constitution. Based on an undisputed factual presentation made almost immediately after suit was filed, this Court issued a temporary restraining order (the "TRO") preserving the status quo. By agreement among the parties the TRO has remained in effect while the litigants have engaged in the discovery and briefing they considered necessary to tender the current motion for decision.

At this point defendants have moved to dismiss this action on myriad grounds,[2] and the matter is fully briefed.[3] For the reasons provided in this memorandum opinion and order, the motion is granted in part and denied in part.

### Facts

Midwest is the general contractor on a project (the "Project") to dredge and reconstruct the Lake Michigan lakefront at Winthrop Harbor, Illinois to provide marina facilities (¶ 13). Midwest's contract is with the Illinois Capital Development Board ("CDB"), a state agency (id.). E & E and Easlick are subcontractors on the Project (¶ 16). All Individual Plaintiffs have been

---

**1.** Midwest was added as a party plaintiff by the First Amended Complaint (the "Complaint") filed September 8.

**2.** Defendants have not bothered to identify just which Fed.R.Civ.P. ("Rules") provisions they invoke in their motion. Most of the grounds advanced are appropriate under Rule 12(b)(6) as asserting plaintiffs have failed to state a cause of action upon which relief may be granted. Under Rule 12(b)(6) this Court must accept as true all well-pleaded factual allegations, drawing all reasonable inferences in plaintiffs' favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822

F.2d 31, 34 (7th Cir.1987) (per curiam)). This opinion's factual statement conforms to that requirement, citing to allegations of the Complaint in the form "¶—" and to its exhibits as "Ex.—."

**3.** Plaintiffs' responsive memorandum is styled in part a "Memorandum ... in Support of Cross–Motion for Summary Judgment." That latter motion, which was procedurally insufficient, has been withdrawn and is not before the Court.

employed by E & E (*id.*) and then Easlick (¶ 18) to work on the Project.

Individual Defendants are officials of Department, which is responsible for enforcing Act § 3:

> Whenever there is a period of excessive unemployment in Illinois, every person who is charged with the duty, either by law or contract, of constructing or building any public works project or improvement for the State of Illinois or any political subdivision, municipal corporation or other governmental unit thereof shall employ only Illinois laborers on such project or improvement, and every contract let by any such person shall contain a provision requiring that such labor be used: Provided, that other laborers may be used when Illinois laborers as defined in this Act are not available, or are incapable of performing the particular type of work involved, if so certified by the contractor and approved by the contracting officer.

In turn Act § 1 defines two critical operative terms:

> (1) "Illinois laborer" refers to any person who has resided in Illinois for at least 30 days and intends to become or remain an Illinois resident.

> (2) "A period of excessive unemployment" means any month immediately following 2 consecutive calendar months during which the level of unemployment in the State of Illinois has exceeded 5%....

Throughout the relevant period unemployment in Illinois has exceeded 5% (¶ 12), so Department has sought to enforce the Act.

In October 1986 Department informed Midwest that its employee Kenneth Reed ("Reed") was not an Illinois laborer, directing that he be terminated. Department provided neither Reed nor Midwest with a hearing to determine whether Reed qualified as an "Illinois laborer." Midwest complied with Department's directive and was thereby deprived of Reed's services (¶ 14). In June 1987 the same scenario was repeated with Roger Rose (¶ 17).

All Individual Plaintiffs work for Easlick and E & E on their respective phases of the Project. By July 10 each had resided in Illinois for 30 days and intended to remain here (¶ 19).[4] On July 10 Department Labor Conciliator David Hubbs ("Hubbs") (now a defendant) wrote to Easlick and E & E (¶ 21 and Ex. A), with copies and a forwarding letter to Midwest (¶ 22 and Ex. B), saying Department had determined Individual Plaintiffs were not eligible to work on the Project and directing that they be "removed from the project at the close of business" that day. Hubbs' letters (Ex. A) also threatened an injunction against continued work on the Project if Individual Plaintiffs were not removed.

While Department officials had visited the Project site about a month earlier and questioned Individual Plaintiffs, none of the latter was given any hearing before Department ruled they were not "Illinois laborers" (¶ 20). Fearing an injunction that would shut down the entire Project, Midwest directed Easlick to cease its portion of the work as soon as it received Hubbs' letter (¶ 23 and Ex. E). This action, the TRO and the "standstill agreement" continuing the TRO followed in quick succession.

### *Prior "Preference Act"*

In 1984 the Act was adopted by the Illinois General Assembly promptly after its predecessor Preference Act[5] had been de-

---

**4.** Complaint ¶ 19 also asserts Individual Plaintiffs are "Illinois laborers as defined in the Preference Act." That, of course, is a legal conclusion rather than a factual assertion. As this opinion will develop, that has caused some confusion on defendants' part.

**5.** Under the prior Preference Act (Ill.Rev.Stat. ch. 48, ¶ 271):

> Every person who is charged with the duty, either by law or contract, of constructing or building any public works project or improvement for the State of Illinois or any political subdivision, municipal corporation or other governmental unit thereof shall employ only Illinois laborers on such project or improvement, and every contract let by any such person shall contain a provision requiring that such labor be used: Provided, that other laborers may be used when Illinois laborers as defined in this Act are not available, or are incapable of performing the particular type of

clared unconstitutional by both the Illinois Supreme Court (*People ex rel. Bernardi v. Leary Construction Co.,* 102 Ill.2d 295, 80 Ill.Dec. 36, 464 N.E.2d 1019 (1984)) (under the Privileges and Immunities Clause) and our Court of Appeals (*W.C.M. Window Co. v. Bernardi,* 730 F.2d 486 (7th Cir.1984)) (under both the Privileges and Immunities Clause and the Commerce Clause). Given the Act's close similarity to its unconstitutional predecessor, defendants' submissions to this Court might have been expected to describe the statutory differences and to explain how the changes made by the General Assembly overcame the prior constitutional difficulties.

But defendants have inexplicably ignored both *Leary Construction* and *W.C.M. Window* (their memoranda cite *W.C.M. Window* only in passing and never even mention *Leary Construction*!), instead purporting to argue from first principles on issues that have already been conclusively decided against them. While a few of defendants' contentions have at least surface merit, most plainly do not. Nevertheless this opinion, after describing the constitutional claims raised by plaintiffs, will address each of defendants' contentions in turn.

### Plaintiffs' Challenges to the Act

Plaintiffs attack the Act as violating the Due Process, Equal Protection, Privileges and Immunities and Commerce Clauses in a number of ways:

1. Due process challenges include, among others (¶ 31):

(a) depriving Corporate Plaintiffs of the right to employ out-of-state residents;

(b) depriving recent migrants to Illinois of their right to employment;

(c) basing the presumption of excessive unemployment on an unrealistically low figure and using statewide rather than local data to see whether that figure has been exceeded;

(d) using a 30–day residence requirement rather than more reliable indicia; and

(e) enforcing the Act without hearings to determine compliance.

2. Privileges and immunities challenges comprise (¶ 33):

(a) preventing employers from hiring without regard to citizenship and requiring them to use certain hiring methods;

(b) preventing new residents from working in Illinois;

(c) preventing nonresidents from working in Illinois; and

(d) treating Illinois residents as nonresidents if their families live outside Illinois.

3. Equal protection challenges involve (¶ 35):

(a) infringing the fundamental right to travel;

(b) discriminating against the class of workers who do not live with their families;

(c) discriminating against the class of workers who have previously worked for the same contractor in another state;

(d) discriminating against the class of workers who have resided in Illinois less than 30 days; and

(e) using a different criterion for residency to vote than to work.

4. Commerce Clause challenges are (¶ 39):

(a) erecting barriers to entry by out-of-state laborers; and

(b) requiring new residents to sit idle for 30 days before working.

Finally, plaintiffs seek damages against Individual Defendants under 42 U.S.C. § 1983 ("Section 1983") for all the asserted violations.

---

work involved, if so certified by the contractor and approved by the contracting officer. Persons were deemed "Illinois laborers" if they resided in Illinois for at least one year before their employment (*id.* ¶ 269). Thus the Act differs from its predecessor in just three respects—

(1) by applying only when statewide employment exceeds 5%, (2) by reducing the residency requirement from one year to 30 days and (3) by requiring that a worker intend to become or remain an Illinois resident.

### Standing

■ Defendants repeatedly assert that all Individual Plaintiffs lack standing to challenge the Act because they claim to be Illinois residents and the Act therefore does not apply to them (D. Mem. 2, 3, 5, 7, 9; D.R. Mem. 2–4). Almost without exception,[6] defendants' standing argument is nonsensical.

For any Individual Plaintiff to have standing, he[7] must satisfy three elements (*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)):

   1. He must have personally suffered an actual or threatened injury because of defendants' conduct.

   2. His injury must be fairly traceable to defendants' challenged action.

   3. His injury must be redressable by the court.

Each Individual Plaintiff unquestionably satisfies each of those requirements, and defendants really do not maintain otherwise. It is irrelevant for standing purposes that Individual Plaintiffs assert they satisfy the Act's residency requirements—a legal conclusion. What has caused their injury—the operative fact that confers standing—is that defendants *say* they do not and want them fired on that account.

Even apart from defendants' untenable view of the residency factor, most of the due process and equal protection challenges do not rest on Individual Plaintiffs' residence anyway. Rather they focus on the lack of pre-deprivation hearings, infringement of the fundamental right to travel and classifications among residents.

Finally, the standing argument raised by defendants does not even apply to the Corporate Plaintiffs. They, after all, are harmed by defendants' enforcement of the Act whether or not Individual Plaintiffs are Illinois residents.

All Plaintiffs have standing to bring this action. This is the first of the arguments defendants should not have made in good conscience.

### Eleventh Amendment Immunity

■ Defendants correctly contend the Eleventh Amendment requires dismissal of Department itself from this action—even the declaratory aspects (*Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)).[8] Of course, because plaintiffs have also sued Department officials in their official capacity, seeking injunctive relief against them (¶ 10) for violations of federal constitutional rights, it has been settled at least since *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) that suit may proceed as to them.

As for plaintiffs' damage claim (the Fifth Claim, ¶¶ 40–43 and related prayer for relief), it is specifically limited to Individual Plaintiffs. Where plaintiffs have gone astray in purely technical terms is in failing to make clear in the case caption that they are suing Individual Defendants in their personal as well as their official capacities. There is no reason not to allow the Complaint to be amended to conform the caption to the operative allegations (see Rule 15(a)).

### Privileges and Immunities

■ Complaint ¶ 33 invokes both the Privileges and Immunities Clause (U.S. Const. art. IV, § 2) and the Fourteenth Amendment's Privileges or Immunities Clause. Because *W.C.M. Window* spoke of

---

**6.** As discussed below, the specialized standing requirements of the Privileges and Immunities Clause do arguably raise problems for Individual Plaintiffs—but those problems too are overcome here.

**7.** This is not chauvinistic usage. Although the principles discussed in the text of course apply irrespective of gender, all the Individual Plaintiffs here happen to be male.

**8.** As *Pennhurst* reaffirmed (*id.* at 100–01, 104 S.Ct. at 907–08), the "jurisdictional bar applies regardless of the nature of the relief sought." If states are immune from both injunctive relief and damages in federal court, it necessarily follows that they are immune from declaratory relief.

the former and because the two clauses share a common jurisprudence, this opinion will employ the slightly different terminology ("and" rather than "or") of Article IV.

In any event, the two clauses have their own jurisprudence of standing. As plaintiffs concede, corporations have long been barred from asserting claims under the Privileges and Immunities Clause (*Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 177, 181, 19 L.Ed. 357 (1869)). Accordingly the Complaint's Second Claim may be pursued only by Individual Plaintiffs.

Defendants urge that because the Privileges and Immunities Clause does not allow citizens of a state to complain of its own laws (*United Building and Construction Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden*, 465 U.S. 208, 217, 104 S.Ct. 1020, 1027, 79 L.Ed.2d 249 (1984)) and because Individual Plaintiffs say they are Illinois residents, they cannot assert a claim. Of course this case would be over if defendants were to accept Individual Plaintiffs as bona fide residents of Illinois. But it is defendants who insist Individual Plaintiffs are citizens of another state and who seek to prevent them from working here *for that reason.* That insistence has given rise to the case and controversy here. In terms of this dispute, at least, the nonresident label that defendants attach to Individual Plaintiffs should be treated as implicating the constitutional guaranty.

Defendants have offered no other basis for arguing Individual Plaintiffs have failed to state a claim under the Privileges and Immunities Clause. To the contrary, it is clear the claim is more than substantial, given *W.C.M. Window* and *Leary Construction.*

9. Indeed, even were defendants right in their argument, they would defeat only the Commerce Clause claim, not the Complaint itself. *Leary Construction,* 102 Ill.2d at 300–01, 80 Ill. Dec. at 39, 464 N.E.2d at 1022 pointed out "a 'market participant' determination is irrelevant in a case which is litigated under the privileges and immunities clause," rendering the state's "reliance on the 'market participant' analysis in *White* ... misplaced." Thus the Privileges and Immunities claims are unimpeded by "market participant" notions.

## Commerce Clause

■ Defendants next assert no Commerce Clause violation has been alleged because the state is acting as a market participant, rather than as a regulator of the market (*White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983)). Their statement of the legal distinction is correct, but it does not compel dismissal of the Complaint at this threshold stage.[9]

By its terms, the Act applies not only to state construction projects but to those of all political subdivisions and other governmental entities. When the Act is applied to such local projects, the state is acting more as a regulator than as a participant (*W.C. M. Window,* 730 F.2d at 495–96).

Complaint ¶ 13 identifies Midwest's contract for the Project as having been awarded by CDB—not of itself conclusive on this issue. Defendants have submitted the affidavit of CDB employee Robert Pierce stating the Project is "funded entirely by revenue of the State of Illinois" (D.Mem.Ex.). But the current Rule 12(b)(6) motion must be decided on the face of the Complaint. Whether the state is indeed acting as a market participant is a factual issue, which must await trial or a summary judgment motion.

## Due Process

■ Department's asserted due process violation lies in its having determined, without holding any hearings, that Corporate Plaintiffs cannot employ Individual Plaintiffs (and others).[10] Plaintiffs claim that

10. Plaintiffs also advance other due process claims:
    1. They purport to find such a violation in defendants' mere efforts to enforce a facially unconstitutional law. But in those terms any law found unconstitutional for some reason would also violate due process—a needless redundancy.
    2. They appear to assert substantive (as contrasted with procedural) due process claims based (a) as to Corporate Plaintiffs, on their rights to employ out-of-state residents and (b) as to Individual Plaintiffs, on their

infringes the due process rights of both employers and employees. As *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir.1987) (quoting *Cunningham v. Adams*, 808 F.2d 815, 820 (11th Cir.1987)) has stated the test:

> To establish a due process violation, [plaintiffs] must show: "(1) a protected property or liberty interest, and (2) that [they were] deprived of that interest by government action and without due process of law."

Defendants first contend Corporate Plaintiffs have no protected interest at stake here because they (D.Mem. 4):

> do not have any right to employ individuals. That was determined by the passage of the 13th Amendment to the U.S. Constitution.

That assertion is patently ludicrous and unworthy of serious comment.[11] Of course Corporate Plaintiffs have protected interests in conducting their businesses, in their contracts to build the Project, in their contracts with each other and in their contracts with their employees (cf. *Brock v. Roadway Express, Inc.*, —— U.S. ——, 107 S.Ct. 1740, 1746–47, 95 L.Ed.2d 239 (1987) (contractual right to discharge employee is protected property interest)).

Next defendants suggest Individual Plaintiffs have no protected right in their employment. D.Mem. 4 first says Individual Plaintiffs had "no more than a unilateral expectation of private employment." That isn't true: They had jobs. And of course an employee's interest in continued employment—a contract right—is entitled to protection from governmental interference without due process.[12]

Thus the only issue is not plaintiffs' entitlement to due process, but rather what process is due. In that respect, defendants are right in saying not all deprivations of property or liberty interests require a pre-deprivation full evidentiary hearing. But defendants go farther, suggesting plaintiffs have gotten all the procedural protection they need. Yet the employee's interest in continued employment is certainly substantial (*Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 543, 105 S.Ct. 1487, 1494, 84 L.Ed.2d 494 (1985)), and the Supreme Court has consistently held due process requires some kind of hearing before a discharge (*id.* at 542, 105 S.Ct. at 1493).[13] At this preliminary stage of the litigation, there is no factual record on which to determine whether Individual Plaintiffs received the kind of hearing to which they were entitled.

---

rights to seek employment. Plaintiffs offer no authority to suggest those rights are substantively rooted in the Due Process Clause. They have not been since the *Lochner* era.

**11.** P.Mem. 10 n. 2 provides a classic instance of understatement in characterizing defendants' assertion as "at best curious." Not content with that mild reproof, D.R.Mem. 5 responds: "People, furthermore, cannot constitute corporate property subject to due process protection." Enough is enough. Defendants' attack on the Complaint via the prohibition on slavery is an idea that should never have been conceived, much less committed to paper and filed in a memorandum of law.

**12.** Indeed, defendants seem to have forgotten the fundamental premise that property rights are defined by *state* law—and "rights" are jural relationships enforced by courts (*Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). Under Illinois law (as in most jurisdictions), the kind of relationship exemplified by the employer-employee situation—even if not for a fixed term—is pro-

tected against third-party interference by creating the familiar tort of interference with advantageous relationships (e.g., *Kemper v. Worcester*, 106 Ill.App.3d 121, 62 Ill.Dec. 29, 435 N.E.2d 827 (5th Dist.1982)). Although some such interference is legally privileged, whether that privilege extends to defendants' conduct here begs the ultimate question of the legitimacy of the state's interest. For the present it is enough to recognize the clear existence of a property interest in the continuation of the employment relationship.

**13.** *Loudermill* involved a public employee, whereas here we have private employees (working on a public project) subject to discharge at the government's behest. Though it would seem the same level of procedural protection is due in the two instances, neither party has addressed the issue. There is the possibility (unexplored to this point) that the type of determination made here (the bona fides of a residency claim) is either more or less susceptible to error-free determination without a hearing. If so, a different level of protection could be called for (a different kind of "process" may be "due").

Defendants raise a more substantial difficulty by noting plaintiffs' apparent failure to seek approval from the contracting officer to employ non-Illinois laborers because Illinois laborers could not be obtained. Under the Act, employers are clearly authorized to seek such approval. And the Complaint has not suggested why that route was not followed, nor has it asserted a basis for believing that any review triggered by the refusal of such approval would be deficient in due process terms.

But even in those terms the Complaint would not succumb. Individual Plaintiffs challenge Department's conclusion, without the benefit of a hearing, that they are not Illinois laborers. Nothing in the Act's certification and approval process provides for a review of that determination. Once again, without a well-developed factual record it is not appropriate to decide plaintiffs have been afforded all the process to which they are due.[14]

### Equal Protection

■ As already indicated, Complaint ¶ 35 asserts the Act violates the Equal Protection Clause by impinging the fundamental right to travel. Without citing any authority, defendants assert the right to travel is not infringed because the Act only prohibits Individual Plaintiffs from taking certain types of employment once they have traveled to Illinois. But "the right to migrate protects residents of a State from being disadvantaged, or from being treated differently, simply because of the timing of their migration, from other similarly situated residents" (*Attorney General of New York v. Soto–Lopez*, 476 U.S. 898, 106 S.Ct. 2317, 2322, 90 L.Ed.2d 899 (1986)). Clearly the Act deprives new migrants to Illinois of a significant opportunity. To withstand scrutiny, then, the Act's restrictions must

be necessary to further a compelling state interest (*id.*, 106 S.Ct. at 2322 n. 4).

Complaint ¶ 35 also says the Act and Department's enforcement methods create a number of classifications that violate equal protection:

1. treating workers who have resided in Illinois less than 30 days differently from those who have resided here longer;

2. treating workers whose families live in another state differently from those whose families live in Illinois; and

3. treating workers whose prior employment was with an out-of-state contractor differently from others.

Defendants retort Individual Plaintiffs are merely objecting to the way the residency requirement was applied in their individual cases. But *as alleged*, the distinctions are class-based and invidious—and that suffices to save the Complaint from dismissal.

Maybe the facts will ultimately show Department's policy does not create the last two alleged classifications. But again the Complaint charges Department does classify in that way. Were those classifications found to burden the right to travel, each would be subject to heightened scrutiny. And even if they do not, the classifications must still withstand "rational basis" scrutiny.

### Qualified Immunity

■ Each Individual Defendant is entitled to qualified immunity from damages unless her or his actions in enforcing the Act violated a clearly established right (*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). To avoid creating such immunity, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" (*Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)).[15]

---

**14.** Defendants also suggest plaintiffs can avail themselves of other state procedures such as an original writ of certiorari or a breach of contract action. However, they never explain how those procedures would provide adequate pre-deprivation hearings.

**15.** Defendants also rely on *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.1986) as requiring that "the facts of the existing case law must closely correspond to the contested action before the defendant official is subject to liability under '... *Harlow*." But *Benson* limited that statement to situations where officials had to balance individual rights and governmental in-

Defendants say their actions violated no clearly established right because, while the Act's predecessor was declared unconstitutional, the Act itself has not been. Yet defendants fail to identify even one difference between the Act and its predecessor that salvages its constitutionality!

Because defendants seem to have difficulty grasping the issue (their D.R.Mem. 9–10 is really a repeat of D.Mem. 11–12), it bears a brief walkthrough. *Leary Construction* and *W.C.M. Window* (both of which, as already pointed out, defendants choose to ignore) certainly articulated "clearly established" constitutional rights. To pose a reductio ad absurdum, had the General Assembly followed those cases by a verbatim reenactment of the predecessor Act, defendants could not even arguably have raised the shield of qualified immunity. Although the legislature did not do that, what it did enact was so close to its predecessor that, absent a far more compelling presentation on the part of Department than has been advanced to date, the rights defendants violate in enforcing the Act must also be viewed as "clearly established." As *Anderson*, 107 S.Ct. at 3039 (citation omitted) stated the test:

> This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of preexisting law the unlawfulness must be apparent.

### Abstention

■ As an overriding argument, defendants invoke *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) to suggest this Court should abstain on the constitutional issues to allow state courts to construe the Act. *Pullman* abstention is appropriate only when a statute is "obviously susceptible of a limiting construction" that would save its constitutionality (*Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 237, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984) (quoting *Zwickler v. Koota*, 389 U.S. 241, 251, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967)).

There is no ambiguity in the Act's straightforward provisions (with one possible—though nondispositive for current purposes—exception [16]), defendants offer no possible limiting construction, and none suggests itself to this Court. Abstention is not appropriate.

### Injunctive Relief

■ Finally, defendants say plaintiffs cannot meet the requirements for obtaining an injunction because they have an adequate remedy at law and cannot show an irreparable injury. Even were that so, the Complaint would survive—plainly the suitability of injunctive relief goes to the remedy, and not to whether plaintiffs have stated a claim for which relief may be granted.

Nevertheless this Court is constrained to advise defendants that injunctive relief is a particularly appropriate remedy when the harm is prospective enforcement of an unconstitutional statute. Our Court of Appeals affirmed an injunction against the Act's predecessor in *W.C.M. Window*, without pausing to consider whether other forms of relief would be adequate. This Court will do likewise.[17]

---

terests on a case-by-case basis (*id.*). No such balancing is called for here, so it would appear *Benson* does not apply. Even if it did, however, *Leary Construction* and *W.C.M. Window* surely fit the bill—absent a showing that the statutory differences pose at least a plausible distinction in light of those decisions.

16. As a possible partial exception, a state court might tell defendants they are misapplying the Act § 1 reference to "resid[ing] in Illinois" by excluding Individual Plaintiffs from that category. That, however, would not resolve many of the issues posed by the Complaint and discussed in this opinion. *Pullman* abstention does not counsel the splintering and deferral of closely-linked constitutional challenges of the types presented here.

17. It is particularly objectionable to be told by a litigant that adequate remedies at law are available, and yet to have the proffered examples include a declaratory judgment action (which plaintiffs seek here!) and a writ of certiorari—both equitable remedies. If defendants are really suggesting plaintiffs should be forced to go to state court to redress the deprivation of their federal constitutional rights, they utterly misperceive the role of federal courts in our system.

*Conclusion*

Individual Plaintiffs have stated claims under the Privileges and Immunities, Commerce, Due Process and Equal Protection Clauses of the United States Constitution, and they have hence advanced a cause of action under Section 1983. Corporate Plaintiffs have stated claims under each of those provisions except the Privileges and Immunities Clause. Defendants' motion to dismiss under Rule 12(b)(6) is therefore granted as to Corporate Plaintiffs' claims under the Second Claim for Relief, but denied in all other respects.

Department is immune from federal court suit on the Complaint's claims and is therefore dismissed as a defendant. Individual Defendants may not be sued for damages in their official capacities. Leave is granted to amend the Complaint's caption to conform to its text, making it clear the damage claims are brought against them personally.

This action is set for a status hearing at 9 a.m. December 3, 1987. At that time counsel should come prepared to discuss plans for the preliminary injunction hearing and all other aspects of the lawsuit.[18]

---

**18.** P.Mem. 4 and 16 ask for Rule 11 sanctions—attorneys' fees and expenses—because of the emptiness of defendants' arguments. Because defendants were busy reasserting the same arguments, their Reply Memorandum did not speak to that subject (except to invoke Rule 11 themselves on an untenable ground, R.Mem. 3–4). This opinion has not addressed the matter, except perhaps inferentially by ruling on defendants' dismissal contentions. Consequently the litigants may want, in anticipation of the status hearing, to discuss dealing with the possible renewal of plaintiffs' request.